(No. 4514—

J. L. SIMMONS COMPANY, INC., A DELAWARE CORPORATION, Claimant, *vs.* STATE OF ILLINOIS, Respondent.

*Opinion filed December 18, 1953.*

WALTER DAY, Attorney for Claimant.

LATHAM CASTLE, Attorney General; C. ARTHUR NEBEL, Assistant Attorney General, for Respondent.

TOLSON, C. J.

On May 16, 1952, J. L. Simmons Company, Inc., filed its complaint against the State of Illinois for the sum of $48,224.34, said sum being the balance claimed due it under a contract for the construction of the Mt. Vernon State Tuberculosis Sanitarium at Mt. Vernon, Illinois.

The prayer for relief requested a summary judgment in the amount of $22,334.64, which amount was not in dispute, and an award of $25,889.70 for the balance claimed under the contract.

The record consists of a complaint, motion of claimant for summary judgment, transcript of evidence, abstract of evidence, statement, brief and argument of claimant, and statement, brief and argument of respondent.

On March 20, 1953, this Court granted the motion for summary judgment in the amount of $22,334.64, which leaves the remaining claim of $25,889.70 for determination.

The facts of the case are as follows:

On October 8, 1948, the claimant was awarded a contract to construct the Mt. Vernon State Tuberculosis Sanitarium. (Reference will be made at a later time in this opinion to the contract, correspondence and architectural drawings.)

After the top soil was stripped from the building site, a "substance" was encountered that could not be removed with power equipment, and the contractor was obliged to use air hammers and dynamite to complete the excavation.

On March 5, 1949, the Simmons Company notified Philip B. Maher, the architect for the State, of this condition, and requested a meeting of all interested

parties at the site of operations to determine the amount of additional compensation that Simmons Company would be entitled to under its contract, and for the State to consider revising its drawings to take advantage of this newly discovered condition by raising the elevations of the bottom of the pier footings, thereby saving certain costs for materials.

Thereafter, a series of letters were written between the parties, which resulted in a change order, wherein the State received a credit of $587.50 for the savings in material.

The claim of the Simmons Company for extra compensation for "rock excavation" was carefully skirted by the State Architect in the correspondence heretofore referred to, but, in the letter of May 1, 1950, between Philip B. Maher, State Architect, and C. Herrick Hammond, Supervising Architect for the State, Mr. Maher recommended the settlement of the claim in the amount of $25,889.70 on the basis that the substance encountered was not known to exist by either party, and was properly compensable under Article XXII of the general contract.

On June 30, 1951, C. Herrick Hammond, Supervising Architect, accepted the proposal of the Simmons Company on behalf of the State, and ordered the necessary changes.

The building was completed and accepted by the State, and, when final payment was requested by the Simmons Company, the Department of Finance, before executing the voucher, requested an opinion from the Attorney General covering this payment, and, on receiving an adverse ruling, declined to issue a voucher for the disputed item.

Two questions are presented to this Court for consideration:

1. Can the Supervising Architect effect a change in the contract, which would increase the amount of the contract?

2. If the Supervising Architect can amend the contract, was the "substance" rock within the meaning of the contract?

The contract, specifications and drawings cover hundreds of pages, and by the terms are construed together as one document. The one architectural drawing introduced in evidence is a plot plan of the site, which details the elevations of the land involved, discloses locations of certain borings, as well as the nature of the sub-soil encountered. The drawing states that there is no rock or quick sand on the site, but also states that the test borings are not to be used by the contractor in the preparation of estimates, and is not a part of the contract.

The "substance" that caused this difficulty was broken up in granules by the auger when the borings were made, and, when examined by the bidders, in no way represented its true character when the top soil was removed. It is conceded by all parties that the nature of this "substance" was unknown when the contract was let, and that additional borings by the contractor would not have revealed its true character.

The following portions of the contract appear to be controlling in the matter of its interpretation:

### AGREEMENT

ARTICLE IV: UNIT PRICES FOR CHANGES: The following unit prices will apply in the event additions to or deductions from the work to be performed under this contract are required:

|  | Unit Prices | |
|---|---|---|
|  | Add | Deduct |
| No. 1—1:2½:4 concrete per yard...................... | $25.00 | $22.00 |
| No. 2—1:2:3½ concrete per yard...................... | 26.00 | 23.00 |
| No. 3—Reinforcing steel per 100 #.................... | 14.00 | 12.00 |
| No. 4—Forms per square foot.......................... | .60 | .50 |
| No. 5—Earth excavation per yard (hand)............... | 3.50 | 3.00 |
| No. 6—Earth excavation per yard (machine)............. | 1.25 | 1.05 |
| No. 7—Rock excavation per yard (if encountered)....... | 40.00 | 35.00 |

ARTICLE V.   The Contractor and the Owner agree that the General Conditions of the Contract, the Specifications and the Drawings, together with this Agreement, form the Contract, and are as fully a part of the Contract as if hereto attached or herein repeated.

ARTICLE VI:   It is understood and agreed by and between the Parties hereto that this Contract is the entire agreement between the Parties, and that no alterations, changes or additions therein shall be made, except in writing approved by the Parties hereto.

### GENERAL CONDITIONS OF THE CONTRACT

ARTICLE 1.

PRINCIPLES AND DEFINITIONS:

(b)   The Owner, the Contractor, and the Supervising Architect are those named as such in the Agreement. They are treated throughout the Contract Documents as if each were of the singular number and masculine gender.

ARTICLE 2.

EXECUTION, CORRELATION AND INTENT OF DOCUMENTS:

The Contract Documents shall be signed in triplicate by the Owner and Contractor. In case of failure to sign the General Conditions, Drawings, or Specifications, the Supervising Architect shall identify them.

The Contract Documents are complementary and what is called for by any one shall be as binding as if called for by all. The intention of the documents is to include all labor and material reasonably necessary for the proper execution of the work. It is not intended, however, that materials or work not covered by, or properly inferable from, any heading, branch, class or trade of the specifications shall be supplied, unless distinctly so noted on the drawings. Materials or work described in words which so applied have a well known technical or trade meaning shall be held to refer to such recognized standards. When the specifications and drawings conflict, the specifications shall govern.

ARTICLE 8:

THE SUPERVISING ARCHITECT'S STATUS:

The Supervising Architect shall have general supervision and direction of the work. He is the Agent of the Owner only to the extent provided in the Contract Documents. He has authority to stop the work whenever such stoppage may be necessary to insure the proper execution of the Contract.

ARTICLE 9:

THE SUPERVISING ARCHITECT'S DECISIONS:

The Supervising Architect shall, within a reasonable time, make decisions on all claims of the Owner or Contractor and on all other matters relating to the execution and progress of the work or the interpretation of the Contract Documents.

ARTICLE 10:

FOREMAN, SUPERVISION:

The Contractor shall give sufficient supervising to the work using his best skill and attention. He shall carefully study and compare all drawings, specifications and other instructions and shall at once report to the Supervising Architect any error, inconsistency or omission which he may discover.

ARTICLE 22:

CHANGES IN THE WORK:

The Owner, without invalidating the Contract, may make changes by altering, adding to or deducting from the work, the Contract sum being adjusted accordingly. All such work shall be executed under the conditions of the original contract, except that any claim for extension of time caused thereby shall be adjusted at the time of ordering such change.

No change shall be made, unless in pursuance of a written order from the Supervising Architect, stating that the owner has authorized the change, and no claim for an addition to the Contract sum shall be valid unless so ordered.

The value of any such change shall be determined in one or more of the following ways:

(a) By estimate and acceptance in a lump sum.
(b) By unit prices named in the contract or subsequently agreed on.

ARTICLE 23:

CLAIM FOR PAYMENT:

If the Contractor claims that any instructions, by drawings or otherwise, involve extra cost under this Contract, he shall give the Supervising Architect written notice thereof before proceeding to execute the work, and, in any event, within two weeks of receiving such instructions. No such claims shall be valid unless so made.

ARTICLE 25:

CERTIFICATES AND PAYMENTS:

If the Contractor has made application as above, the Supervising Architect shall, not later than the date when each payment falls due, issue to the Contractor a certificate of such amount as he decides to be properly due.

The following correspondence reflects the interpretation placed on the contract by the Simmons Company and the architects for the State:

509

J. L. SIMMONS CONPANY, INC.

5 March, 1949

Philip B. Maher, Architect
157 East Erie St.
Chicago, 11, Illinois

Gentlemen:

SUBJECT:  Mt. Vernon State Tuberculosis Sanitarium, Mt. Vernon,
Illinois—Rock Excavation.

The writer visited the above subject job on February 16, 1949, and inspected the excavation at the request of our superintendent, Mr. Carl Stephens, who the day before had taken some snapshots showing the various parts of the excavation. We are enclosing one print of eight different pictures, as we were at the time in a very hard rock like shale.

When in the office of the Division of Architecture and Engineering the following week on another matter, the writer mentioned to Mr. C. W. Macardell the fact that we had hit this very hard material, and were having considerable trouble in dislodging it, having to use a backhoe in the bottom of the excavation, crosscutting in one way, and then using a dragline bucket from a crane on the bank to pick up the crumbs on the excavation.

The writer has kept in touch with Mr. Stephens, and this condition has steadily grown worse, until on Saturday, 26 February, our superintendent called my office in Springfield, and advised that this shale strata had become so hard that it was necessary to dynamite in order to dislodge any of this material. The State superintendent on the job, Mr. Clifford Jones, is fully advised of the existing condition, and the writer understands that he has submitted samples of this material to his office in Springfield, together with a report concerning the nature of the excavation.

It is requested that either a representative of your firm, or the State of Illinois, or both, visit the site of the operations, and determine with our superintendent the amount of rock excavation involved, so that we may be compensated according to the terms of our contract.

It is further requested that consideration be given to raising the elevation of the bottom of the pier footings Nos. 10, 11, 12, 22, 23, 24, 42, 41, and 40, that is, if the same material is encountered in those pier footings as was encountered in the rest of the excavation.

Very truly yours,

J. L. SIMMONS COMPANY, INC.

J. L. SIMMONS COMPANY, INC.

Springfield, Illinois
6 May, 1949

Philip B. Maher, Architect
157 East Erie Street
Chicago, 11, Illinois

SUBJECT:   Mt. Vernon State Tuberculosis Sanitarium,
           Mt. Vernon, Illinois—Rock Excavation

Gentlemen:

We enclose three prints each of drawing marked Rock Excavation, Mt. Vernon Tuberculosis Sanitarium, Mt. Vernon, Illinois, dated 4/20/49, together with three photostats each showing footing numbers, and the amount of hand rock excavation in each footing, and section numbers on general rock excavation, as identified on previously mentioned drawing.

You will note that the total rock excavation constitutes 2,746 cubic yards. These prints are for your information and study, and for presentation to the State of Illinois for payment at the cubic yard price as set out in our contract.

Very truly yours,

J. L. SIMMONS COMPANY, INC.

PHILIP B. MAHER
ARCHITECT
June 30, 1949

J. L. Simmons Company, Inc.
2146 North Woodford Street
Decatur, 60, Illinois

Attention:  Mr. Fred A. Berndt

Gentlemen:

Mt. Vernon State Tuberculosis Sanitarium

We have checked your allowances for certain columns because of their shorter length due to soil conditions at the site, and arrive at a figure of $587.50 credit instead of $507.00, which you submit.

In regard to the extra claimed for rock excavation, we have discussed this matter with our engineers, and our representative on the job, McCoy & Wilson, and neither recognize the material excavated to be "rock" as mentioned under the term of your contract calling for a removal price of $40.00 per cubic yard.

Very truly yours,

/a/      W.T.S.
Walter T. Stockton

PHILIP B. MAHER
ARCHITECT
May 1, 1950

To:   C. Herrick Hammond, Supervising Architect
        Springfield, Illinois

The J. L. Simmons Company has submitted to us a request for extra compensa-
tion for removal of so-called rock formation encountered by them during the
excavating work for the Mt. Vernon State Tuberculosis Sanitarium. The net
extra requested is $25,889.70, and the quantity involved is 2,958 cu. yds. out of
a total of 7,475 cu. yds. taken from the excavation.

The above amount is the result of checking by your representative, Mr. Clifford
Jones, and has been agreed upon by all concerned as being correct. The area
under consideration is at the south central and southeast portion of the building.

We have asked the J. L. Simmons Company to submit expense records to sub-
stantiate their statement, and we have on file copies of weekly labor and material
costs for excavation work from December 5, 1948, thru May 8, 1949. The following
figures and facts are presented herewith as a matter of record:

Actual Cost

|  |  |  |  |
|---|---|---|---|
| Bulk, Trench, and Hand Excavation | | $25,322.60 | |
| Superintendent and Time Keeper | | 4,950.00 | |
| | | | $30,272.60 |

Less Estimated Cost

|  |  |  |  |
|---|---|---|---|
| Bulk Excavation | 6080 Cu. Yds. @ $1.00 | $6,080.00 | |
| Trench Excavation | 785 Cu. Yds. @ 1.50 | 1,178.00 | |
| Hand Excavation | 610 Cu. Yds. @ 3.00 | 1,830.00 | |
| | | | 9,088.00 |

|  |  |
|---|---|
| Net Extra Cost | $21,184.60 |
| Overhead and Profit, 21% | 4,448.77 |
| Bond, 1% | 256.33 |
| Total Extra Cost | $25,889.70 |

As to the actual material encountered, our engineer, Mr. Syberen Frank Nydam,
has had samples of it in his office for some months. It does not have the properties
of genuine rock, but seems to be a kind of shale, which becomes rock-like on
exposure to air, and disintegrates when placed in water. Our representative on
the job, Mr. Harry Throgmorton of McCoy & Wilson, has stated on two occasions
that the material is not "rock", and our own observations lead us to the same
conclusion in the light of the unit prices set up in the General Contract, wherein
rock is implied as being a material of sufficient hardness and density to demand
the payment of $40.00 per cubic yard for its removal "if encountered". The cost
of removing this material was about $8.30 per yard.

Since the specifications do not provide for any material other than "earth" and "rock", and it is generally agreed that the material under discussion is not "rock", it is, therefore, technically impossible to approve the extra compensation requested by the contractor.

However, as you are aware, there is shown on the first sheet of the architectural drawings a complete record of all borings taken on the site. While this is distinctly labeled as not being a part of the drawings, and the State is in no way obligated therefor, it is nevertheless an accurate record of the borings, and, they do not, and, in our opinion, no amount of additional borings would disclose the conditions, which developed as the excavating progressed. In other words, there is nothing the general contractor could have done to warn him of the situation encountered. Furthermore, you will recall he has submitted a credit of $587.50 because of the fact that certain columns were not required to be extended to the depths shown on the drawings due to the hardness of the bearing surface.

Therefore, because of the fact that the State recognized by the words "if encountered" that they are willing to compensate a contractor for removal of a certain type of material not known to exist on the site at the time of awarding the contract, and, since a similar condition exists at the Mt. Vernon State Tuberculosis Sanitarium, we will be pleased to be a party to further discussion, if you agree with us that the J. L. Simmons Company is entitled to a hearing.

Very truly yours,
W.T.S.
Walter T. Stockton

DIVISION OF ARCHITECTURE AND ENGINEERING
June 30, 1951

To: J. L. Simmons Company, Inc.

From: Supervising Architect

I have been directed to notify you of the acceptance of your proposal, dated June 8, 1951, in the amount of Twenty Five Thousand Eight Hundred Eighty Nine and 70/100 Dollars ($25,889.70) for the following additional work:

> Because rock was unexpectedly encountered in the excavations, as outlined in proposal, dated June 8, 1951, to which is attached breakdown.

A formal order will be forwarded you for signature coincident with its execution by the officers so authorized to execute the order for the State.

Pending receipt of the above order, it is requested that this letter be taken as authority to proceed with the work.

Yours very truly,

DEPARTMENT OF PUBLIC WORKS
AND BUILDINGS.

DIVISION OF ARCHITECTURE AND ENGINEERING
October 11, 1951

To:     J. L. Simmons Company, Inc.

From:   Supervising Architect

Under date of June 8, 1951, you submitted a proposal to this office covering the cost to you of rock excavation in connection with the above project, and you were notified, under date of June 30, 1951, of its acceptance.

Our letter of acceptance was based on advice from the Director of the Department of Public Health that its acceptance met with his approval; however, he so informed this office, without awaiting the advice of the Department of Finance, to whom the matter had been referred, and, who, in turn, referred it to the Attorney General.

You have been informally advised of the action taken by the Attorney General, as well as the Departments of Finance and Public Health, and we quote from the Attorney General's letter to the Department of Finance, expressing his opinion, that the Director of Finance should not approve such a payment, as follows:

"It is therefore apparent that this contract contains an express stipulation as to the compensation to be paid. The contract contains no provision, which can be construed to authorize payment of an additional amount due to the fact that excavation at the site proved more onerous and costly than originally contemplated by the contractor.

I am therefore of the opinion that the Director of Finance should not approve an invoice voucher for payment of this additional amount of $25,889.70 to the J. L. Simmons Company, Inc. under contract 66546."

Yours very truly,

DEPARTMENT OF PUBLIC WORKS
AND BUILDINGS.

The State contends that the contract price was a flat bid, and, if the work became more onerous than was contemplated, the contractor was nevertheless obliged to complete it according to the terms thereof.

Complainant contends that the contract price is a general figure, subject to change by additions or subtractions, all under the direction of the Supervising Architect, that changes in fact were made, which were both beneficial and detrimental to the State.

This Court recognizes that contracts for public works involving the expenditure of hundreds of thousands of dollars are by their very nature complex, and that it

is virtually impossible to anticipate every contingency that may develop. Some latitude and discretion must be placed with someone to handle these matters on behalf of the State, and by the terms of this contract the Supervising Architect was delegated to effect these changes.

Article V of the agreement states affirmatively that all of the documents pertaining to the contract form the "contract", and Article II of the general conditions states that all of the documents are complementary, and what is called for in one shall be as binding as if called for by all.

The Court, therefore, concludes that the restrictive interpretation suggested by respondent cannot be followed, but that the contract must be construed in the light of all documents in evidence.

Considering first the plot plan of the site—the document shows the location of 15 test borings, the sub-soil data chart is a positive representation of the nature of the sub-soil.

The appendix contains a positive statement that no rock or quick sand will be encountered. Also in positive terms is a precautionary note advising contractors not to use test boring data in the preparation of estimates, as it is not a part of the general contract.

The leading case construing such contracts is *Hollerback* vs. *United States*, 233 U. S. 165, in which plaintiff filed a suit in the United States Court of Claims to recover on a contract for extras for the repair of a dam on Green River, Kentucky. Plaintiff alleges certain representations in the contract prepared by the Government stated that the present dam was backed with broken stone, sawdust and sediment to a given depth, when, in fact, such statement was in error. The

contract included the usual statements that a bidder was to visit the site, and make his own investigation to enable him to make an intelligent proposal.

The Court of Claims ruled that the contractor was at fault for not making the required investigation, and denied the claim. On appeal the Supreme Court held to the contrary.

"A government contract should be interpreted, as are contracts between individuals, with a view to ascertaining the intention of the parties, and to give it effect accordingly, if that can be done consistently with the terms of the instrument. In Paragraph 33 the specifications spoke with certainty as to a part of the conditions to be encountered by the claimants. True, the claimants might have penetrated the seven feet of soft slushy sediment by means of which they would have discovered the log crib work filled with stones, which was concealed below, but the specifications assured them of the character of the material, . . a matter concerning which the government might be presumed to speak with knowledge and authority. We think the positive statement of the specifications must be taken as true and binding upon the government, and that upon it, rather than upon the claimants, must fall the loss resulting from such mistaken representations. We think it would be going quite too far to interpret the general language of the other paragraphs as requiring independent investigation of facts, which the specifications furnished by the government as a basis of the contract left in no doubt. If the government wished to leave the matter open to the independent investigation of the claimants, it might easily have omitted the specification as to the character of the filling back of the dam. In its positive assertion of the nature of this much of the work, it made a representation upon which the claimant had a right to rely without an investigation to prove its falsity."

The Court of Claims of Illinois in the case of *Arcole Construction Company* vs. *State,* 11 C.C.R. 423, followed the rule laid down in the Hollerback case, and the facts of that case are as follows:

Claimant, Arcole Construction Company, was awarded a contract to repave Roosevelt Avenue in the City of Chicago. Plans and specifications were prepared by the State, and through oversight no reference was made to that portion of the road bed containing abandoned street rail ties, which were embedded in concrete, and not visible through ordinary examination. The contractor was unable to remove this portion of the high-

way with power shovels, but had to resort to air hammers to chip it out. The extra expense amounted to $24,944.85, and a claim was made for this amount. The Court ruled that where plans and specifications are prepared by the owner, and there is a *material misrepresentation* therein, and, as a result of such misrepresentation, the contractor is misled to his damage, he is entitled to recover the damage so sustained. An award of $23,092.09 was granted.

The present case might well be decided on the basis of a *material misrepresentation*, as set forth in the Arcole case, supra. However, the claimant and Supervising Architect have placed their own construction on the contract to arrive at the same conclusion.

This was probably brought about in that the State amended the contract to effect a savings in the amount of $587.50, and, since the claimant did not press his claim for removal of "rock" at the rate of $40.00 per cubic yard, as provided by Article IV of the agreement, Article XXII of the general conditions of the contract was used as the medium in determining the amount of the extra costs encountered by claimant.

The courts of this State have held that the interpretation of a contract made by the parties themselves will be given great weight. In the case of *Lehmann* vs. *Revel*, 254 Ill. 262, the court ruled that the Park Commissioners, who had accepted the benefits of a contract, which was in part illegal, in that it exceeded the powers of the municipality, were estoppeled to defend on the theory of lack of powers.

This Court, therefore, concludes that claimant is entitled to recover on either the theory of *material misrepresentation*, or the contract as interpreted by the parties themselves, providing the removal of the "sub-

stance" was not part of the contract, which claimant
was obliged to perform according to its terms.

Claimant has introduced into evidence a sample
of the "substance" encountered at the building site.
It is about 3 inches by 4 inches, and one inch thick. In
its present condition, it is extremely hard and heavy,
and gives the typical appearance of a paper weight.
It is conceded that when first taken from the ground
it presents a different character, and thereafter hardens.
Carl M. Bays, a recognized geologist, testified that the
"substance" was a true rock, coming from the Pennsyl-
vania strata. Respondent contends that the "sub-
stance" was not a true rock, but admitted that the
material was dense, compact, indurated and stratified.

It is interesting to note that the Department of
Public Works and Buildings, through its Division of
Highways, has defined the word "rock" as follows:

STANDARD SPECIFICATIONS FOR ROAD AND
BRIDGE CONSTRUCTION

SECTION 11.  ROADWAY EXCAVATION

Construction Methods

Earth Excavation.  All roadway excavation shall be classified as earth excava-
tion, except those materials provided for in rock excavation.

Rock excavation.  Rock excavation shall include:

(a)  All boulders and rocks measuring ½ cubic yard or more.
(b)  Solid or ledge rock that cannot be excavated without resorting to con-
tinuous drilling and blasting.
(c)  Slate, shale, sandstone, and other hard material that cannot be exca-
vated with a modern power shovel of ¾ cubic yard capacity, adequately
powered, and in good mechanical condition, without continuous drilling
and blasting. The Contractor shall prove by demonstration that slate,
shale, sandstone, or other hard material encountered cannot be moved
with heavy equipment without continuous drilling and blasting.

The last edition of *Words and Phrases* at pages
572 and 573 has the following definition:

ROCK

"Rock is meant the stratum or formation of stone, or other fixed, hard material underlying and supporting the loose material of which the surface of the earth is ordinarily composed, and includes a rock known as soapstone." *Okey* vs. *Mayers* 91 N.W. 771; 117 Iowa 514.

ROCK EXCAVATION

"All conglomerate deposits so firmly cemented as to present characteristics of solid rock and which it is not practicable to excavate with a *power shovel*, except after drilling and blasting . . . may be classified as "Rock Excavation", which may include "hardpan" which is a cemented or compact deposit." *Lathers* vs. *State*, 229 N.W. 50; 238 Wisconsin 291.

In the light of this evidence, it is apparent that the "substance" encountered was true "rock" within the meaning of the contract, and is, therefore, compensable as an extra.

An award of $25,889.70 is hereby granted to the complainant, J. L. Simmons Company, Inc., A Delaware Corporation.